IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-00334-01-CR-W-NKL |
| | ) | |
| ALBERTO JIMENEZ-MARQUEZ, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion to Suppress Evidence and Statement (doc #23). For the reasons set forth below, it is recommended that this motion be denied.

## I. INTRODUCTION

On September 13, 2007, a criminal complaint was filed against defendants Alberto Jimenez-Marquez and Rueben Alvarez-Puga charging that between September 13, 2006 and September 13, 2007, the defendants knowingly conspired with each other and others to distribute more than one kilogram of cocaine.

On October 3, 2007, the Grand Jury returned a two count indictment against defendant Jimenez-Marquez. Count One of the indictment charges that between September 13, 2006 and September 13, 2007, defendant Jimenez-Marquez knowingly conspired with others to distribute cocaine in an amount of 500 grams or more. Count Two charges that on September 12, 2007, defendant Jimenez-Marquez knowingly possessed with the intent to distribute cocaine in an amount of 500 grams or more.

On December 20, 2007, an evidentiary hearing was begun on defendant's motion to suppress. Defendant Jimenez-Marquez was represented by retained counsel Henri J. Watson. The Government was represented by Assistant United States Attorney Bruce Rhoades. The Government called Officer Jeremy Buske and Detective Mario Florido of the Kansas City, Missouri Police Department as witnesses. Defendant Jimenez-Marquez testified on behalf of the defense.

The hearing concluded on January 11, 2008. Defendant Jimenez-Marquez was again represented by Mr. Watson and the Government was represented by Mr. Rhoades. The Government recalled Officer Jeremy Buske of the Kansas City, Missouri Police Department to testify. No witnesses were called to testify for the defense.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. The following facts were set forth in Detective Mario Florido's Affidavit in support of the Criminal Complaint which was filed on September 13, 2007:

    * * *

    4. On September 5, 2007, Detective Mario Florido of the Kansas City, Missouri Police Department's Drug Enforcement Unit was contacted via cellular telephone by a Cooperating Source (CS) about an Hispanic male whom he/she knew to be "Juan" LNU. Juan LNU was observed contacting an unknown black male at 3010 College, Kansas City, Jackson County, Missouri. The CS stated "Juan" met the black male in front of the residence and then went inside with him. Approximately five minutes later "Juan" walked out of the residence carrying what appeared to be a medium size black nylon bag. The CS stated he/she believed it to be a narcotics transaction as he/she has known "Juan" for two years and knew him to be selling marijuana and/or cocaine. The CS stated "Juan" arrived and departed in a black Chevrolet pick-up Missouri license 512-XG9. A computer check of the license through the Missouri Department of Revenue responded back to a Jose Yanez of 1629 Topping, Kansas City, Missouri, on a 1999 Chevrolet pick-up. A computer check of 3010 College responded as an active drug house as of June 11, 2007.

    5. Det. Florido relayed the aforementioned information to several officers of the East Patrol Division. On September 12, 2007, at approximately 6:30 p.m., Police Officer (PO) Buske was on routine patrol in the area of 30th and College streets. PO Buske observed the block to have numerous cars parked on both sides of the street, including 3010 College. PO Buske continued around the block when he observed a black 1999 Chevrolet pick-up truck, Missouri license 512-XG9, occupied by two unknown Hispanic males coming from the area of 30th and College streets. PO Buske stated the black Chevrolet pick-up truck drove past him westbound toward Benton Boulevard on 30th Street. PO Buske stated the black truck failed to stop at a posted stop sign at 30th and Benton Boulevard while turning northbound onto Benton Boulevard. PO Buske conducted a traffic violation stop of the vehicle at Victor and Benton Boulevard. PO Buske made contact with the driver and explained to him why PO Buske had stopped him. The driver identified himself as Yanez, Jose, Hispanic male, 01-29-1967. This individual was later positively identified through the Fingerprint Identification Unit as Jimenez-Marquez, Alberto, Hispanic male, 04-24-1967. PO Buske asked for Jimenez-Marquez's driver's license and insurance which Jimenez-Marquez could not produce. The passenger was identified as Alvarez-Puga, Rueben, Hispanic male, 03-17-1979. PO Buske asked

the occupants to exit the vehicle. At this time Jimenez-Marquez was placed under arrest for no driver's license. PO Wisdom conducted an inventory of the vehicle prior to towing. PO Wisdom located a black CD case containing a brick shaped object wrapped in beige tape. It was recovered from under the center of the rear bench seat of the truck. The brick shaped object wrapped in beige tape is consistent with the packaging of a kilogram of cocaine. This item field tested positive for the presence of cocaine.

6.  Detective Mario Florido was contacted from the scene via telephone. Detective Mario Florido and Detective Cory Horalek responded to Victor and Benton Boulevard and contacted the officers. At this time the following items were recovered from the vehicle, a black Nextel cellular telephone, U.S. currency in the amount of $81.00, an application for title in the name of Jose Yanez of 1629 Topping and a brown colored wallet containing miscellaneous paperwork and U.S. currency in the amount of $223.00. Recovered from Jimenez-Marquez's right front pants pocket was a Motorola Razor cellular telephone. Detectives recovered U.S. currency in the amount of $1,052.00 from Alvarez-Puga.

7.  Detective Florido contacted Jimenez-Marquez and read aloud to him the Miranda Waiver in Spanish.[1] Jimenez-Marquez stated he understood his rights and agreed to speak with Detective Florido. Jimenez-Marquez stated that an individual by the name "Jose" LNU placed the kilogram of cocaine in his truck earlier in the day and he was instructed to deliver it to a black male in the area of 30th and College. Jimenez-Marquez said that he has done this several times for "Jose" in the past. Jimenez-Marquez said he gets paid $500.00 each time. Jimenez-Marquez said he delivers whatever "Jose" places in his truck and believes "Jose" has someone else pick up the money at a later time. Jimenez-Marquez said that "Jose" sometimes places the cocaine in plastic bags. Jimenez-Marquez said he had a good idea "Jose" was placing cocaine in his vehicle. Jimenez-Marquez said that he used to live at 1629 Topping but now lives at 3225 Independence Avenue, apartment 3E. Jimenez-Marquez said that 1629 Topping was under construction. Jimenez-Marquez said that this was the only time the passenger (Alvarez-Puga) had gone with him and he did not know what Jimenez-Marquez had in the truck.

8.  Detective Mario Florido and Cory Horalek made contact with Alvarez-Puga. Detective Mario Florido read aloud to him the Miranda Waiver in Spanish. Alvarez-Puga stated he understood his rights and agreed to talk with the detectives. During the interview Alvarez-Puga stated that he was picked up by Jimenez-Marquez in Independence and was asked to go with him to a friend's house. Alvarez-Puga stated that he just went along for the ride to accompany Jimenez-Marquez. Alvarez-Puga stated he did not know what Jimenez-Marquez had in his truck. Alvarez stated that Jimenez-Marquez appeared nervous when the police stopped them. Alvarez-Puga stated that his address was 1629 Topping and that it was being remodeled.

9.  Both Jimenez-Marquez and Alvarez-Puga were transported to police headquarters where they were booked in for Conspiracy to Distribute Cocaine.

\* \* \*

---

[1] Detective Florido testified that he speaks Spanish. (Government's Ex. 1 at 17)

12. The above mentioned CS was shown a photograph of Jimenez-Marquez and the CS positively identified Jimenez-Marquez as the "Juan" LNU listed above.

(Government's Ex. 2)

2. Detective Florido testified that in sharing with other officers the information set forth above in Fact No. 1, ¶ 4, he did not issue a directive that any individual driving the black Chevrolet pick-up Missouri license 512-XG9 be stopped and investigated. (Government's Ex. 1 at 17) Rather, Detective Florido told the officers that if they located this vehicle and if they had a reason to stop the vehicle, to go ahead and stop it. (Government's Ex. 1 at 17)

3. Officer Jeremy Buske testified that he was on patrol in the area of 30th and Benton Streets the evening of September 12, 2007. (Tr. I[2] at 9-10) Officer Buske testified that he had previously received information about narcotics activity in this area. (Tr. I at 13) Officer Buske had been told that there was a house in the area of 30th and Benton where a lot of activity was going on and to be on the lookout for a black, newer model Chevrolet pickup truck in the area. (Tr. I at 14, 17) Officer Buske was also told that the suspects were of Hispanic origin. (Tr. I at 17) Officer Buske testified that he had been told that if there was probable cause to make a stop, that is if he observed any type of law being broken, he was to pull over the pickup truck and proceed in the normal manner and then forward any details of the stop to the appropriate unit. (Tr. I at 15)

4. At approximately 6:30 p.m. on September 12, 2007, Officer Buske's attention was drawn to a vehicle matching the description of the vehicle which was included in the information he had previously received about narcotics activity. (Tr. I at 12-13) Officer Buske was able to see that the driver of the vehicle was a Hispanic male. (Tr. I at 16) Officer Buske pulled in behind the vehicle and decided to follow it for a few minutes to see where it was going. (Tr. I at 15-16) Officer Buske testified that the vehicle did not make a complete stop at the intersection of 30th and Benton. (Tr. I at 21) According to Officer Buske, the vehicle "kind of rolled through the stop sign."[3] (Tr. I at 21) At that point, Officer Buske engaged his overhead lights to conduct a traffic violation stop. (Tr. I at 21) The vehicle pulled over around Victor and Benton. (Tr. I at 21)

5. Officer Buske was patrolling in a paddy wagon. (Tr. I at 10-11) The paddy wagon is marked and equipped with all the lights and equipment found on a regular police car, including audio and video recording equipment. (Tr. I at 10-11) In addition to having video capability like a police car, the paddy wagon allows officers to video what goes on in the back of the wagon. (Tr. I at 11) Officer Buske testified that the video began rolling when he turned on the overhead lights. (Tr. I at 21) However, the video that was made is of the back of the wagon. (Tr. I at 22) Prior to this stop, Officer Buske had dropped off an arrest at the station and the camera had been switched to the back. (Tr. I at 22) Officer Buske had forgotten to switch the camera

---

[2] "Tr. I" refers to the transcript of the hearing held on December 20, 2007.

[3] Defendant Jimenez-Marquez testified that he stopped and then turned right. (Tr. I at 112)

4

back to the front. (Tr. I at 22)

6.  After the vehicle stopped, Officer Buske put out over the air the traffic violation to dispatch. (Tr. I at 22) Officer Buske then exited the paddy wagon, turned his mic on and approached the vehicle. (Tr. I at 22) Officer Buske identified himself to the driver of the vehicle[4] and told him why he had been pulled over.[5] (Tr. I at 23) Officer Buske asked the driver for his driver's license and proof of insurance on the vehicle. (Tr. I at 24) The driver was not able to produce either.[6] (Tr. I at 24) Officer Buske radioed for back-up because he was planning on placing the driver under arrest for driving without a driver's license and insurance.[7] (Tr. I at 24)

7.  After back-up arrived, Officer Buske had the driver and passenger exit the vehicle. (Tr. I at 25) The driver was placed under arrest for not having a driver's license and for not having insurance on the vehicle.[8] (Tr. I at 25) Defendant Jimenez-Marquez testified that he was handcuffed as soon as he got out of the truck. (Tr. I at 115) Officer Buske then did a computer check on the driver's and passenger's names. (Tr. I at 26) The driver had identified himself as Jose Yanez. (Defendant's Ex. 7) The name given by the driver came back with two Kansas City warrants. (Tr. I at 26) There was no driver status on either the driver or the passenger in the computer. (Tr. I at 26) While the passenger produced a Kansas driver's license, the fact that there was no driver status on him in the computer led Officer Buske to believe that it was probably not a valid driver's license. (Tr. I at 26-27)

8.  Officer Buske testified that he placed the driver under arrest for the outstanding

---

[4] Officer Buske identified defendant Jimenez-Marquez as the driver of the vehicle. (Tr. I at 23)

[5] Defendant Jimenez-Marquez testified that Officer Buske did not mention the stop sign nor did he tell the defendant why he had been pulled over. (Tr. I at 119) Officer Buske clearly mentioned the stop sign violation as recorded on the videotape provided to the Court. (Defendant's Ex. 2; Defendant's Ex. 6)

[6] The driver did pull a card out of his pocket and give it to Officer Buske. (Tr. I at 57; Defendant's Ex. 3) The name appearing on the card was Jose Yanez. (Defendant's Ex. 3) Officer Buske testified that the driver gave him the card for identification purposes. (Tr. I at 57) Officer Buske does not recall the driver saying that the card was a Mexican driver's license. (Tr. I at 57-58) As demonstrated on the videotape, it is very difficult to understand what the driver is saying. (Defendant's Ex. 2) When asked the first time "You got a driver's license?" the driver replied "Uh, Mexican [unintelligible] license." (Defendant's Ex. 2) A little later the driver is again asked "You got a driver's license?" to which the driver replied "No." (Defendant's Ex. 2; Defendant's Ex. 6) The officer once again asks "You don't have a driver's license?" and the driver again replies "No." (Defendant's Ex. 2; Defendant's Ex. 6)

[7] Defendant Jimenez-Marquez testified that he did not hear Officer Buske use his radio to call for assistance. (Tr. I at 113-114) Officer Buske clearly used his police radio to request that officers meet him at Victor and Benton as recorded on the videotape provided to the Court. (Defendant's Ex. 2; Defendant's Ex. 6)

[8] While defense counsel presented proof of insurance on the pickup at the hearing, the insurance card was not in the vehicle when it was stopped. (Tr. I at 58-60, 64-66)

5

warrants as well as the traffic violations. (Tr. I at 27)

9. Officer Buske testified that a search of the vehicle was conducted incident to arrest as well as for inventorying the vehicle prior to towing it. (Tr. I at 27) Officer Buske testified that it is standard police procedure to inventory a vehicle prior to towing it. (Tr. I at 27) The vehicle needed to be towed because neither the driver nor the passenger had a valid driver's license. (Tr. I at 27) Further, there was no insurance on the vehicle which made it illegal to drive the vehicle on the city streets. (Tr. I at 27-28)

10. A kilo of cocaine was discovered during the search of the vehicle. (Tr. I at 28) Officer Buske notified the Drug Enforcement Unit of the Kansas City Police Department. (Tr. I at 76) Detective Florido signed the arrest approval for the driver and passenger. (Defendant's Ex. 7) After being fingerprinted at headquarters, it was determined that the driver's name was Alberto Jimenez-Marquez, rather than Jose Yanez. (Defendant's Ex. 7)

11. Officer Buske testified that with all the commotion, he forgot to issue the driver any traffic tickets. (Tr. I at 62)

### III. DISCUSSION

Defendant Jimenez-Marquez seeks to suppress all evidence seized and statements obtained as a result of the stop of the vehicle driven by defendant on September 12, 2007. In support of his motion, defendant argues "the stated reason for his arrest was pretextual and that his arrest was illegal for having been made without warrant and without probable cause." (Motion to Suppress Evidence and Statement (doc #23) at 2) As clarified at the initial hearing, defendant is contending that the initial stop was not valid and that suppression is warranted based on the invalidity of the initial stop. (Tr. I at 3) Defendant admits that he was given Miranda warnings, that he understood them and that he voluntarily made a statement without any threats. (Tr. I at 3) According to defendant, the validity of the statement hinges on whether or not the arrest was legal. (Tr. I at 3)

The Court finds that the initial stop of defendant Jimenez-Marquez' vehicle was lawful. As the Eighth Circuit Court of Appeals has observed, "a traffic violation–however minor–creates probable cause to stop the driver of the vehicle." United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007); United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002), cert. denied, 538 U.S. 992 (2003); United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000). Prior to pulling the vehicle over, Officer Buske observed that the vehicle did not make a complete stop at the intersection of 30th and

Benton. (See Fact No. 4, supra) According to Officer Buske, the vehicle "kind of rolled through the stop sign." (Id.) This traffic violation provided probable cause to stop the vehicle.[9] The fact that Officer Buske might also have suspected that defendant Jimenez-Marquez was engaged in illegal conduct given the information Officer Buske had previously received does not invalidate the traffic stop. In United States v. Cummins, 920 F.2d 498 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991), the Eighth Circuit Court of Appeals found:

> In our view, this otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity. It is also our view that the stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions.

Id. at 501. See also United States v. Herrera-Gonzalez, 474 F.3d 1105, 1109 (8th Cir. 2007)("the subjective intentions of the officer making the stop are irrelevant in determining the validity of the

---

[9] The Court notes that defendant Jimenez-Marquez testified that he stopped at the stop sign. (See Fact No. 4, n.3, supra) The Court must therefore judge the credibility of the defendant versus the credibility of the officer. With respect to defendant Jimenez-Marquez, the Court notes that he also testified that Officer Buske did not mention the stop sign nor did he tell the defendant why he had been pulled over. (See Fact No. 6, n.5, supra) However, the videotape and transcription provided to the Court clearly show that Officer Buske pointed out the stop sign violation to defendant. (See Fact No. 6, n.5, supra) Further, the Court notes that defendant Jimenez-Marquez told Officer Buske that his name was Jose Yanez and provided identification in that name. (See Fact Nos. 6, n.6 and 7, supra) However, after he was fingerprinted at headquarters, it was determined that the driver's real name was Alberto Jimenez-Marquez, rather than Jose Yanez. (See Fact No. 10, supra) Defendant contends that Officer Buske is not credible because he did not end up writing defendant any tickets. (Defendant's Suggestions in Support of His Motion to Suppress Evidence and Statements (doc #28) at 3) Officer Buske testified that given all the commotion, he forgot to issue the tickets. (See Fact No. 11, supra) The Court finds that after the kilo of cocaine was discovered and defendant Jimenez-Marquez was booked for conspiracy to distribute cocaine (see Fact No. 1, ¶ 9, supra), it was understandable that Officer Buske neglected to issue tickets for the lesser violations he had observed. Finally, defendant contends that Officer Buske is not credible because "he just conveniently forgot to press the button that activated the camera pointing towards the front of the vehicle" and as a result did not videotape defendant stopping at the stop sign. (Defendant's Response to Government's Supplemental Suggestions in Opposition to Defendant's Motion to Suppress Evidence and Statements (doc #40) at 2) However, the evidence presented to the Court indicates that the camera does not begin to record until the officer turns on the overhead emergency lights. (See Fact No. 5, supra) Even if the camera had been recording the front of the vehicle, rather than the back, there would not be video of defendant stopping at or rolling through the stop sign because Officer Buske would not have activated his lights to pull over the defendant until the traffic violation had occurred. The Court finds the testimony of Officer Buske to be more credible than that of defendant Jimenez-Marquez. Therefore, the Court finds the traffic violation did occur.

7

stop"); United States v. Coney, 456 F.3d 850, 855-56 (8th Cir. 2006)(officer has probable cause to conduct a traffic stop when he observes a minor traffic violation, even if the traffic stop is a pretext for other investigation).

After he was stopped, defendant Jimenez-Marquez was not able to produce a Missouri driver's license or proof of insurance. (See Fact No. 6, supra) Officer Buske was justified in placing defendant under arrest given his various traffic violations, that is failing to stop at a stop sign, failing to have a valid driver's license and failing to provide proof of insurance on the vehicle.

Officer Buske next conducted a computer check on the driver's and passenger's names. (See Fact No. 7, supra) "[T]he law has become well established that during a routine traffic stop, an officer may request a driver's license and ... run a computer check ...." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004). The name given by the driver came back with two Kansas City warrants. (See Fact No. 7, supra) Officer Buske was justified in placing defendant under arrest for the outstanding warrants for Jose Yanez.

The search of the vehicle which followed was permissible both as a search incident to arrest[10] and as an inventory search.[11] See United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990), cert.

---

[10] See New York v. Belton, 453 U.S. 454, 460 (1981)("we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile"); United States v. Searcy, 181 F.3d 975, 979 (8th Cir. 1999); United States v. Williams, 165 F.3d 1193, 1195 (8th Cir. 1999). In this case, defendant Jimenez-Marquez was under arrest for the outstanding warrants (as well as the traffic violations of failing to stop at a stop sign, failing to have a valid driver's license and failing to provide proof of insurance on the vehicle). (See Fact Nos. 7 and 8, supra)

[11] A warrantless inventory search of a vehicle is valid if it is conducted pursuant to standardized police procedures and not done in bad faith or for the sole purpose of investigation. See Colorado v. Bertine, 479 U.S. 367, 372 (1987). As set forth above, Defendant Jimenez-Marquez had been placed under arrest. (See Fact Nos. 7 and 8, supra) It was determined that the passenger did not have a valid driver's license. (See Fact No. 7, supra) In addition, Officer Buske believed that there was no insurance on the vehicle which made it illegal to drive the vehicle on the city streets. (See Fact No. 9, supra) The decision was made to tow the vehicle. (Id.) Officer Buske testified that it is standard police procedure to inventory a vehicle prior to towing it. (Id.) The Court finds that the inventory search was conducted pursuant to standardized police procedures and that it was not done in bad faith or for the sole purpose of investigation.

denied, 502 U.S. 962 (1991). No constitutional violation took place.

Given the Court's finding that the initial stop of the vehicle and the subsequent arrest of defendant Jimenez-Marquez were proper, there is no basis for suppressing defendant's statement.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant's Motion to Suppress Evidence and Statement (doc #23).

Counsel are reminded they have ten days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

　　　　　　　　　　　　　　　　　　　　　　　　　　　/s/ Sarah W. Hays
　　　　　　　　　　　　　　　　　　　　　　　　　　　SARAH W. HAYS
　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE